```
        IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
           DIVISION OF ST. THOMAS AND ST. JOHN
```

UNITED STATES OF AMERICA, )
                         )
        Plaintiff,       )
                         )    Crim. No. 14-cr-33
                         )
v.                       )
                         )
ALVIN THOMAS,            )
                         )
        Defendant.       )
_____)

**ATTORNEYS:**

**Gretchen Shappert, United States Attorney**
**David White, AUSA**
United States Attorney's Office
St. Thomas, VI
   *For the United States of America*,

**Omodare Jupiter, FPD**
**Gabriel Villegas, AFPD**
Office of the Federal Public Defender
   *For Alvin Thomas*.

## ORDER

Before the Court is the remand of the Third Circuit Court of Appeals in this matter.

### PROCEDURAL AND FACTUAL HISTORY

On March 15, 2014, several individuals robbed First Imperial Jewelers ("Imperial") on St. Thomas, United States Virgin Islands. The Virgin Islands Police Department ("VIPD")

was alerted to the robbery by an alarm being activated at Imperial.

A chase of the suspects ensued. VIPD observed and radioed the location and direction of the suspects' flight while in pursuit. During the pursuit, VIPD apprehended Alvin Thomas ("Thomas") and transported him to a police precinct where he made incriminating statements to the police.

On June 12, 2014, Shaquim Fredericks ("Fredericks"), Warkim Gabriel ("Gabriel"), Chefton Newton ("Newton"), and Thomas (collectively "the defendants") were indicted on various charges related to the March 15, 2014, robbery of Imperial. Thomas filed a motion to suppress the incriminating statements he made on that date.

At a July 14, 2014, omnibus hearing, the Court heard the testimony of Officers Derick Greaves ("Greaves") and Dora Theda-Charles ("Charles"). The testimony of Greaves and Charles provided the following details. On March 15, 2014, Central Dispatch, the radio transmission and communication division of the VIPD, informed VIPD officers that an armed robbery was in progress. Central Dispatch further informed the officers that the suspects were fleeing towards Back Street, a road located in downtown Charlotte Amalie, St. Thomas. Greaves proceeded towards Back Street to provide assistance.

As Greaves proceeded towards Back Street, Greaves received another radio transmission. An officer stated "that one of the suspects had passed her going [to] Vester Gade." *Transcript of July 14, 2017, Omnibus Hearing: Testimony of Derick Greaves*, ECF No. 96 at 38:3-4. Shortly thereafter, another call over the radio stated "that suspects were fleeing up Fire Burn Hill towards the Governor's residence." *Id* at 38:10-12. The suspects were running. *Transcript of July 14, 2017, Omnibus Hearing: Testimony of Dora Theda-Charles*, ECF No. 96 at 49:15-16 ("Because according to Central Dispatch, they -- certain suspects were seeing [sic] running in that area."). A final radio transmission from an officer stated that the suspects were proceeding through some bushes and that a firearm had been discharged.

At approximately 10:00 am, Greaves stopped his vehicle in front of the Governor's residence. While preparing his bulletproof vest, Greaves witnessed Thomas exiting the bushes. Greaves ordered Thomas to lie on the ground. Thomas complied with Greaves's order. Greaves testified that while Thomas was complying, Thomas stated that "some guys were in the bushes with guns and [I] saw them, got scared and []ran." *Id.* at 38:24-25. While Thomas was complying with Greaves's order, Charles arrived on the scene. Charles observed that Thomas "had little bits of

brush on him, []was sweaty, and []was shaking." *Id.* at 58:25-59:1. Greaves handcuffed Thomas. After handcuffing Thomas, Greaves left Thomas with Charles. Greaves left to investigate a location where police had apprehended another suspect.

At the omnibus hearing, Thomas, in relevant part, testified:

> I was walking on the road close by government mansion, heading into the Garden Street area.
> . . .
> Q. What happened when you came in contact with police?
> A. Well, I was walking and then I heard "Freeze. Don't move. Get on the ground."
> Q. Did you see who said that?
> A. No.
> Q. Did you comply?
> A. Yes.
> Q. What happened next?
> A. When I got on the ground, the officer came, put handcuffs on me, asked me where the others. I tell him, "I don't know." And he pick me up and carry me over to the police car.

*Transcript of July 14, 2017, Omnibus Hearing: Testimony of Alvin Thomas*, ECF No. 96 at 116:6-117:1.

Charles escorted Thomas back to her squad car. Charles advised Thomas of his rights under *Miranda v. Arizona* and placed Charles in the squad car. Charles held Thomas in her vehicle for roughly an hour until she was ordered to transport Thomas to Callwood Command, a VIPD precinct in St. Thomas. Thomas was not questioned while he was held in the squad car.

Detective Sehkera Tyson ("Tyson") also testified at the omnibus hearing. Tyson explained that at Callwood Command, the defendants were processed in a location referred to as the "booking room." Thomas and another two of the defendants were in the booking room at the same time. In the booking room, all of the defendants were able to see each other. VIPD officers proceeded to provide the three defendants with forms advising the defendants of their *Miranda* rights. Thomas informed Tyson that he wished to make a statement. Tyson advised Thomas of his *Miranda* rights. Thomas signed the form indicating that he understood his rights. Tyson did not take a statement from Thomas at that time due to concerns about Thomas's safety. Tyson's concerns arose from the fact that two of the other defendants were in an area where they might be able to see Thomas as Thomas gave a statement to Tyson. Shortly before 4:30 pm, detectives Sophia Rashid ("Rashid") and Nigel James ("James") took Thomas to an interview room in order to take Thomas's statement in private.

James, who also testified at the omnibus hearing, testified as to what occurred when Thomas was in the interview room. The interview room is a ten foot by ten foot room that contained a desk and three chairs. In the interview room, James read Thomas his Miranda rights. Throughout the course of the conversation,

Thomas, James, Rashid, and ATF Special Agent Bennie Mims were all present. James presented Thomas with a fresh form explaining to Thomas his *Miranda* rights. Thomas signed the form in two different locations. The first location indicates that Thomas understood his rights. The second location indicates that Thomas wished to waive his rights. James then proceeded to take Thomas's statement. Thomas proceeded to describe to James how the defendants orchestrated the robbery. Notably, James testified that Thomas described hearing a shot in the bushes when he went there after the robbery. James also testified that Thomas stated that he went out into the street heading toward Garden Street, and while going out in the street, was apprehended by police. In total, Thomas's interview lasted roughly between 90 minutes and two hours. Throughout the interview, Thomas was calm and forthcoming. The officers asked their questions in a calm manner.

Thomas's recollection of events that occurred after his arrest were significantly different from James's. Thomas testified that at Callwood Command he was repeatedly asked if he wanted to give a statement. Thomas asserts that he repeatedly stated he did not. Furthermore, he testified that various VIPD officers promised that if Thomas made a statement, that Thomas would be able to leave, graduate from school, and even join the

military if Thomas so chose. Thomas testified that he signed a form waiving his Miranda rights. Ultimately, Thomas testified that he only did what VIPD requested in order to return home.

At the end of omnibus hearing, the Court denied Thomas's motion to suppress.

After the omnibus hearing, the matter proceeded to trial. On July 23, 2014, a jury found the defendants guilty of conspiracy to interfere with commerce by robbery, interference with commerce by robbery, and conspiracy to possess a firearm in furtherance of a crime of violence. The defendants appealed their convictions.

In an April 7, 2017, opinion, the Third Circuit affirmed all of the proceedings in this Court except for the Court's denial of Thomas's motion to suppress. *See United States v. Fredericks*, 684 Fed. Appx. 149, 157, 159-65 (3d Cir. 2017). The Third Circuit vacated this Court's order denying the motion to suppress and remanded for this Court to determine whether there was probable cause for Thomas's arrest and, if not, whether his statement was sufficiently attenuated from the unlawful arrest. *Id.* at 157.

## **DISCUSSION**

"The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an

unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1040-41 (1984) (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)). An arrest by a law enforcement officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004). Absent probable cause, evidence obtained from an arrest cannot be used at trial to prove the defendant's guilt. *See Stone v. Powell,* 428 U.S. 465, 482-89 (1976) (describing development of the exclusionary rule, which proscribes courts from using evidence obtained from illegal searches and seizures in criminal trials); *see also Mapp v. Ohio,* 367 U.S. 643, 655 (1961) (incorporating exclusionary rule to state proceedings).

Probable cause exists where the totality of the circumstances known to the officers at the time supported a fair probability that the suspect had committed or was committing a crime. *See Ornelas v. United States,* 517 U.S. 690, 696 (1996); *Beck v. Ohio,* 379 U.S. 89, 91 (1964); *Brinegar v. United States,* 338 U.S. 160, 175-76 (1949). Whether probable cause exists is an objective inquiry. *See Whren v. United States,* 517

*United States v. Thomas*
Criminal No. 14-33
Order
Page 9

U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Even when the officers could have obtained an arrest warrant, it is not necessary if the officers have probable cause. *See United States v. Watson,* 423 U.S. 411, 423-24 (1976) (noting the judicial preference for warrants but "declin[ing] to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like.").

## **ANALYSIS**

The Court is tasked with determining whether Greaves had probable cause to arrest Thomas. In making that assessment, the Court must examine the totality of the circumstances to determine whether the weight of information before the officer, when coupled with the officer's reasonable inferences, established probable cause. *See United States v. Yusuf,* 461 F.3d 374, 390 (3d Cir. 2006) (discussing the cumulative weight of the information in connection with the officer's reasonable inferences). In considering the reasonable inferences of the

officer, the Court is cognizant that "[t]he collective knowledge of the investigating officers is measured in determining probable cause." *United States v. Belle*, 593 F.2d 487, 597 n.15 (3d Cir. 1979). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States,* 517 U.S. 806, 813 (1996).

Here, an alarm at Imperial alerted VIPD that a robbery was in progress. VIPD officers were also informed thereafter by Central Dispatch that suspects were fleeing. VIPD officers reported the specific location and direction of that flight--up Fire Burn Hill toward the Governor's residence through the bushes. From that observation, VIPD could infer that the individuals fleeing the scene of the robbery to Back Street, then Vester Gade, and then through the bushes on Fire Burn Hill to the Governor's residence were fleeing to evade capture. *See generally Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight--wherever it occurs--is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such").

Greaves witnessed Thomas exit the bushes on Fire Burn Hill a short time after VIPD officers had witnessed and reported that the suspects had run into those bushes. Thomas was sweaty, shaking, and covered in brush. An officer could reasonably infer

that a person sweating, shaking, and covered in brush had been running through the bushes. Given Thomas's emergence from the bushes on Fire Burn Hill--the precise location and direction suspects were reported to be fleeing at the time--and his physical appearance--consistent with fleeing for a period of time--it was reasonable for Greaves to conclude that Thomas was one of the robbery suspects in flight from VIPD.

The circumstances presented here are similar to those in *Mathies v. United States*, 374 F.2d 312 (D.C. Cir. 1967). In that case, the DC Circuit found that law enforcement had probable cause to arrest Appellant George Mathies. The DC Circuit found that

> [a]t the precise moment of arrest, Detective Mitchell, the arresting officer, knew that a crime had been committed at Davis Realty Company, had observed the wrecked getaway car, had learned from Officer O'Brien that four men had fled the scene, and that two of them had entered an alley which exited on U Street. During a house-to-house search which followed immediately, he learned that a man had been observed running from the direction of the wreck and entering the premises at 619 U Street. Mitchell, as we have noted, found Appellant "hiding" in the basement. At that critical point abundant probable cause existed to believe that Appellant had fled into the house from the wrecked getaway car only a short distance away and, therefore, was probably one of the participants in the crime.

*Id.* at 316. In *Mathies*, law enforcement officers did not have a specific description of the suspect. Rather, they had information regarding dynamic events involving fleeing suspects

and the location to which one suspect fled. *See id.* Here VIPD knew that a robbery at Imperial had occurred. Additionally, VIPD had information that suspects had fled the scene. Central Dispatch radioed the dynamic path of the suspects flight to officers, the final location and direction up Fire Burn Hill through the bushes toward the Governor's residence. In response, Greaves positioned himself in front of the Governor's residence. Immediately thereafter Greaves apprehended Thomas exiting the bushes on Fire Burn Hill. Given Thomas's emergence from the exact location where VIPD reported the suspects to have fled, it was reasonable for Greaves to infer that Thomas had probably been involved in the robbery. Additionally, Thomas was sweaty, shaking, and covered in brush, further supporting an inference that Thomas was one of the fleeing suspects. *Cf. United States v. Mauk*, 927 F.2d 611 (9th Cir. 1991) (finding probable cause where the defendant was found in the precise location reported by a 911 call only two-three minutes after the robbery had occurred and was sweating heavily consistent with the robber who had been seen running down the street).

While Thomas testified that he happened to be walking on the road close by the Governor's residence at about the time of the Imperial robbery, his account suffers for want of credibility. Indeed, it is hard to conceive how simply walking

along the road--as Thomas testified he was doing--could produce a person who was sweaty, shaking, and covered in brush--as Thomas was when he was arrested. Additionally, Thomas's testimony directly contradicts Greaves's testimony that Thomas exited the bushes. Thomas's testimony also contradicts James's testimony that Thomas stated that Thomas had been in the bushes.

In assessing the credibility of the testimony of a witness, a factfinder may consider the witness's demeanor, potential motives to be untruthful, interest in the outcome of the case, and the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case. *United States v. Boone*, 401 F.2d 659, 662 (3d Cir. 1968). The Court has considered Thomas's demeanor while testifying, his interest in the outcome of the suppression hearing, and the substance of Thomas's testimony. The Court has also considered all of the other evidence offered at the July 14, 2014, omnibus hearing, including the testimony of Greaves and the statement that Thomas made to James in the police precinct. On balance, the Court does not find Thomas's account to be credible. Rather, the Court finds the government's version of events more credible. Indeed, Greaves, Charles, and Thomas were cross examined and testified consistently with one another. *Cf. United States v. Focareta*, 283 Fed. Appx. 81-82 (3d Cir. 2008) (noting that the district

court's findings of fact were not clearly erroneous as they were supported by the officers' consistent testimonies during the suppression hearing, which the district court determined were credible).

Taking into consideration the totality of the circumstances, the Court concludes that Greaves had probable cause to arrest Thomas. *See, e.g., United States v. Muhammad,* 120 F.3d 688, 696 (7th Cir. 1997)("Probable cause exists when at the moment an arrest is made officers have 'facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information' that would sufficiently 'warrant a prudent man in believing that the [suspect] had committed or was committing the offense.'")(alterations in original)(quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)).

Because the Court has determined that Greaves had probable cause to arrest Thomas, the Court need not reach the issue of whether Thomas's statements were sufficiently attenuated from his arrest. *See United States v. Fredericks*, 684 Fed. Appx. 149, 157 (3d Cir. 2017)("we will . . . remand for the District Court to determine whether there was probable cause for Thomas's

arrest and, if not, whether his statement was sufficiently attenuated from the unlawful arrest.").[1]

The premises considered, it is hereby

**ORDERED** that Alvin Thomas's motion to suppress is hereby **DENIED**; it is further

**ORDERED** that Alvin Thomas's motion to strike exhibits and excess pages (ECF No. 139) is **GRANTED** in part; it is further

**ORDERED** that exhibits 1, 9, and 10 to the Government's Notice of Filing and Memorandum (ECF No. 136) are hereby **STRICKEN**; it is further

---

[1] Even if the Court had found that there was no probable cause, suppression would not be appropriate given the attenuation between Thomas's statement and arrest. To determine whether a statement is sufficiently attenuated from an unlawful arrest, a Court examines several factors:
> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (internal citations omitted). Temporally, the arrest and confession occurred approximately six hours apart. In the intervening period, Thomas was provided with Miranda warnings three times. Furthermore, Thomas signed two different advice of rights forms. Additionally, before VIPD had an opportunity to begin interrogating Thomas, Thomas offered to make a statement to VIPD. Thomas's desire to make a statement did not result from VIPD interrogating Thomas, but was an intervening circumstance arising during what appears to be the normal booking process. Finally, to the extent the conduct of Greaves and Charles could be construed as misconduct, a determination the Court finds no basis in the record to make, their conduct was neither flagrant nor possessed of an illicit purpose. Thus, the conduct of the officers does not warrant suppression. *See Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016) (noting that the third factor in the attenuation doctrine favors exclusion "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant").

**ORDERED** that the Government's motion to exceed page limit (ECF No. 140) is **GRANTED;** it is further

**ORDERED** that Alvin Thomas's motion to expedite ruling on remand (ECF No. 152) is **MOOT;** and it is further

**ORDERED** that Alvin Thomas's second motion to expedite ruling on remand (ECF No. 160) is **MOOT.**

S\_____
    **CURTIS V. GÓMEZ**
    **District Judge**